## APPEAL OF GEORGE P. FISHER, EXECUTOR OF THE ESTATE OF ANNA F. HAY.

Docket No. 1775. Submitted July 18, 1925. Decided February 11, 1926.

1. Land held by the estate of a decedent may, for the purpose of valuing the gross estate, have a substantial value, although the land produced no income and no market for its sale had developed.

2. The average price of sales of stocks during the year of decedent's death *held* to be the measure of values of such stocks for estate-tax purposes.

*Dana Latham* and *R. S. Doyle, Esqs.*, for the taxpayer.
*L. C. Mitchell, Esq.*, for the Commissioner.

Before GREEN, MORRIS, and TRUSSELL.

### FINDINGS OF FACT.

The taxpayer is the estate of Anna F. Hay, of which George P. Fisher, of Chicago, Ill., is the duly appointed and qualified executor.

At the time of her death on September 25, 1922, the decedent owned 1,565 shares of the capital stock of the Oconto Co., a Wisconsin corporation, and a like number of shares of the Bay de Noquet Co., a Michigan corporation; also an undivided one-fifth interest, as a beneficiary of a trust, in 1,280 acres of land in and near Oconto, Wis. On the estate-tax return the undivided one-fifth interest in the real estate was valued at $3,000, and the stock in the corporations mentioned was valued at $195,625, or $125 for each two

shares of stock, one share of the stock of each corporation being taken together and treated as a unit. In determining the tax due from the estate, the Commissioner has increased the value of the undivided one-fifth interest in the real estate to $5,228, and has increased the valuation of the shares of stock to $289,525, or $185 per unit.

The real estate in which the decedent owned an undivided one-fifth interest was composed of two tracts. One tract, containing 1,100 acres, was principally marsh land from which marsh hay was cut at a small profit. The other tract was composed of 180 acres of agricultural land, located in the town of Oconto, Wis. It was not suitable for subdivision into lots. This tract of land was usually rented from year to year, but during part of the time a tenant was not procured and during some years the rental was not sufficient to pay taxes on the property. The operation of these tracts resulted in a net operating loss of $3,973.04 for the years 1913 to 1922, inclusive. This loss was a charge upon the land at the time of the decedent's death. These two tracts were offered for sale through agents, but no offers were received. The assessed valuation of an undivided one-fifth interest in the land for the year 1922 was $5,308. This valuation was protested by the trustees but no adjustment was made.

The Oconto Co. and the Bay de Noquet Co. are engaged in the lumber business. Their assets consist chiefly of timber holdings and cut-over land in Michigan and Wisconsin. The stock of both corporations is held by eight individuals and is not listed on any exchange or traded in actively. The authorized capital stock of the Oconto Co. is $1,000,000, consisting of 10,000 shares of $100 par value, while the authorized capital stock of the Bay de Noquet Co. is $100,000, consisting of 10,000 shares of $10 par value. Neither of these corporations maintained a reserve for exhaustion or depletion of the properties. At the date of the death of the decedent, it was estimated that there was sufficient timber on the Wisconsin properties to justify the operation of a mill thereon for 8 or 9 years, and on the Michigan property for about 10 or 11 years.

The consolidated net earnings of the two corporations for the five-year period 1918 to 1922, were as follows:

| EARNINGS. | | LOSSES. | |
|---|---|---|---|
| 1918 | $88,998.94 | 1921 | $324,364.29 |
| 1919 | 260,380.24 | 1922 | 243,811.87 |
| 1920 | 346,184.50 | | |

The average net income for those years was $25,477.51, which is a return of approximately 2 per cent on the stock valued at $125 per unit and little more than 1 per cent valued at $185 per unit.

During the year 1922 there were three sales of the stock of these corporations. The number of units of stock, date of transaction, and price were as follows:

| Number of units. | Date of sale. | Price per unit. |
|---|---|---|
| 40 | Feb. 20, 1922 | $162.50 |
| 22 | Apr. 27, 1922 | 162.50 |
| 15 | Nov. 1, 1922 | 165.00 |

In the case of the first transaction mentioned above, the purchaser first agreed to buy 20 units for $175 per unit, but before the transaction was closed it was agreed that there should be added 20 additional units at $150 per unit. The sales of February 20 and April 27 were made to one of the officers of the corporation by heirs of a former officer. The sale of November 1 was by the same individuals to a company physician.

In the year 1923 a resolution was passed by the board of directors, whereby offers of the stock of the corporation were to be made to employees for $200 per unit. Of this amount, 20 per cent was to be paid in cash, the remainder to be spread over a period of five years. For this remainder the employees were required to give notes bearing 5 per cent interest. Under this arrangement 102 shares of stock were sold. The resolution recited that these sales were to be made to employees for the purpose of increasing their loyalty, and, although the agreements of sale contained no provision with reference to the redemption of the stock, it was generally understood that the company would see that employees purchasing stock would lose no money in connection with the transaction, and in one or two instances the stock was repurchased by the companies at the request of employees.

### DECISION.

The value of the decedent's interest in the lands in controversy at the date of her death was $5,228. The value of the corporation stocks at the date of decedent's death was $162.98 per unit of shares of the two affiliated corporations. Final determination of deficiency will be settled on 15 days' notice, pursuant to Rule 50.

### OPINION.

TRUSSELL: The testimony offered by the taxpayer shows that the interest of the deceased in the lands in question had been held since prior to 1913; that during the period from 1913 to 1922 the income from these lands had been insufficient to pay taxes and other carrying charges; and that the lands had been placed on the market for

sale, but no prospective buyers had appeared.   The value of lands for purposes of the estate tax can not be measured wholly by the amount of income produced or by the fact that during any given period no one has cared to buy such lands.   Lands may have a substantial value even though they produce no income and the market for their sale has not yet developed.   These lands were in and adjacent to a settled community, and it is well known that owners frequently hold such lands in anticipation of realizing their true value from future sales. The record of this appeal does not contain any evidence as to such true value, except the local assessor's valuation and the Commissioner's valuation.   We are, therefore, of the opinion that the valuation placed upon these lands by the Commissioner can not be modified.

The securities held by the estate are stocks in two affiliated corporations, which appear to have been engaged for many years in the lumbering business in the States of Wisconsin and Michigan. The record shows that during a period of five years prior to the decedent's death the average net earnings of the corporation had been $25,477.51 upon an outstanding capital of $1,100,000; that no sales of stock had been made, except transfers between former stockholders and a few sales to employees.   The testimony indicates that the lumbering business could not continue for more than 10 or 12 years, and that, from the average profits during the five years from 1918 to 1922, inclusive, no stockholder could anticipate a sufficient return in dividends to establish a value of the stocks even equal to the amount returned by the taxpayer.

A summary of the record shows that three officers and directors of the corporations issuing the stocks under consideration testified that in their judgment the stocks were not, during 1922, worth in excess of $125 per unit, although during the same year one of these directors purchased a number of shares at different times and at varying prices, which averaged $162.50 per unit; and in the following year these same directors authorized sales of these stock units to employees, on the basis of installment payments, at $200 per unit, and allowed the books of account of the companies to stand showing a valuation of $400 per unit, with no book provision for the depletion of timber resources.   From this record we are able to find one outstanding fact upon which to base a conclusion as to values. The heirs of one deceased former stockholder, desiring to convert their securities into money, were able, during the year 1922, to sell 77 shares at an average of $162.98.   We are thus led to the conclusion that the heirs of the estate here under consideration, had they offered their stock for sale, could not have obtained a higher price

per unit of the two stocks. We, therefore, hold that the unit values of the stocks of these two affiliated corporations were, at the date of decedent's death, $162.98 per unit.